**Elizabeth LIVINGSTON and George Livingston, Plaintiffs,**

v.

**ISUZU MOTORS, LTD., American Isuzu Motors, Inc., and Isuzu Motors of America, Inc., and John Does I Through X, Defendants.**

No. CV–92–50–BU–RMH.

United States District Court, D. Montana, Butte Division.

Dec. 22, 1995.

Steven J. Crowley, Darwin Bunger, Crowley Law Firm, Burlington, IA, Michael C. Coil, Angel, Screnar, Coil, Bartlett & Fay, Bozeman, MT, for Elizabeth Livingston and George Livingston.

Richard A. Bowman, David R. Kelly, Steven L. Reitenour, Bowman & Brooke, Minneapolis, MN, for Isuzu Motors, Ltd.

James M. Ragain, Holland & Hart, Billings, MT, Mary E. Bolkcom, John Q. McShane, David R. Kelly, Steven L. Reitenour, Bowman & Brooke, Minneapolis, MN, for American Isuzu Motors, Inc. and Isuzu Motors America, Inc.

### OMNIBUS ORDER AND OPINION

HOLTER, United States Magistrate Judge.

Pending before the court are numerous post-trial motions which the parties fully briefed and then argued before the court on September 15, 1995. The motions will be discussed in the following order:

I. Plaintiffs' motion to disqualify David Schultz and the firm of Bowman and Brooke.

II. Defendants' motion to stay judgment pending termination of further motions and appeal.

III. Plaintiffs' motion for additur re: punitive damages and motion for new trial re: punitive damages.

IV. Plaintiffs' motion to release exhibits from protective order.

V. Defendants' motion to interview jurors.

VI. Defendants' renewed motion for judgment as a matter of law or for a new trial.

### FACTUAL BACKGROUND

This action arose from a single vehicle, off-road rollover that occurred on August 7, 1989, near Bozeman, Montana. Plaintiff Elizabeth Livingston inadvertently drove her Isuzu Trooper II off the road on which she was traveling. When Livingston attempted to drive back onto the roadway, the vehicle rolled and she was ejected, sustaining a fracture at T–12 that rendered her paraplegic.

The trial of this action began before the undersigned on June 5, 1995, in Butte, Montana. Plaintiffs rested their case on Tuesday, June 13, 1995. Immediately thereafter, defendants moved for a directed verdict and for judgment as a matter of law pursuant to Rule 50, Federal Rules of Civil Procedure. This court denied defendants' motions and defendants proceeded with their case-in-chief on the afternoon of June 13, 1995.

On Wednesday, June 14, 1995, during the testimony of Dr. Richard Stalnaker, a biomechanical engineer, defendants offered into evidence defendants' exhibit 592, a poster-like diagram with dimensions of about 36 inches high by 30 inches wide.[1] The exhibit dis-

---

1. Prior to placing the exhibit on the easel before the jury, defendants' counsel displayed a sheet of paper purportedly duplicating the exhibit to plaintiffs' counsel. Defendants' counsel assured plaintiffs' counsel that the words "Driver Unbelted" had been removed from the copy about to be placed before the jury. Plaintiffs' counsel did not object to the exhibit.

played a listing of plaintiff's injuries sustained in the rollover and showed their specific location by referencing a drawing of a female body. Elizabeth Livingston's name appeared on the top center of the exhibit followed by the words "Driver–Unbelted" in about one- to two-inch letters.

Dr. Stalnaker adjusted the exhibit on the easel, which was about 10 to 15 feet from the jury box. Plaintiffs' counsel requested a sidebar, which the court granted. Following the sidebar, the exhibit was taken down and turned away from the jury. The court sent the jury to the jury room and continued the proceeding out of the jurors' presence. The court estimates the exhibit was before the jury for two to three minutes.

Plaintiffs' counsel moved to sanction defendants for violating the court's order in limine precluding mention of Elizabeth Livingston's failure to use a seat belt. Plaintiffs requested judgment with respect to liability with the trial to proceed on the issue of damages only. In the alternative, plaintiffs requested a mistrial with defendants to incur all costs or for a cautionary jury instruction, at the very least.

After consideration of the issues and argument from the parties, this court struck defendants' defenses and sent the case to the jury on the evidence offered to that point. The jury returned a verdict finding defendants liable and awarding compensatory damages of $2,110,409.19.

## DISCUSSION

### I.

The motion to disqualify David Schultz and the law firm of Bowman and Brooke is now moot.

Counsel have assured the court that Schultz is no longer with the Bowman and Brooke firm and will take no further part in these proceedings.

The second part of the motion was satisfied by Bowman and Brooke filing with the court a document in which the Isuzu defendants acknowledge the possibility that a conflict of interest may exist between the Bowman and Brooke firm and the Isuzu defendants, and that the Isuzu defendants request Bowman and Brooke to continue as their attorneys.

### II.

Defendants' motion to stay judgment pending appeal is granted.

Plaintiffs did not file a brief to oppose this motion. *See* Rule 220–1(i), Rules of Procedure of the United States District Court for the District of Montana (failure to file a brief by the adverse party shall be deemed an admission that, in the opinion of counsel, the motion is well taken).

### III.

■ Plaintiffs' motion for additur re: punitive damages and for a new trial re: punitive damages is denied.

The question was clearly posed to the jury whether punitive damages should be awarded against defendants by the punitive damage verdict question:

"Are the plaintiffs entitled to punitive damages?" The jury answered "No" to this question. Thus, because the jury did not determine entitlement to punitive damages, there is nothing to add to. Liability for punitive damages must be determined by the trier of fact, whether it be judge or jury. Mont.Code Ann. § 27–1–221(6).

Plaintiffs contend the court erred in not affording them the opportunity to present further financial evidence. Whether the court should have permitted counsel to state the net worth of the defendants is frankly questionable, but no further evidence was offered by plaintiffs nor was an offer of proof made by plaintiffs of the defendants' "financial affairs, financial condition and net worth" as required by section 27–1–221(7)(a) of the Montana Code. Because the jury did not reach the query requiring them to determine the amount of damages, the quantum of proof of such damages is moot.

Section 27–1–221 requires determination of punitive damages in an "immediate, separate proceeding." The court afforded counsel several hours to confer about a full settlement of this case after the general verdict was returned and before the punitive damage question was presented to the jury. During the entire time counsel were attempting to negotiate a settlement, the jury was sequestered. When the case did not settle, the court proceeded to submit the punitive damage question to the jury.

It was Friday afternoon on the tenth day of trial; to delay submitting the punitive damage question until a later date was unwarranted from the standpoint of efficient use of the court and its facilities and from the standpoint of jury utilization. Counsel should have been prepared to proceed to the "immediate, separate proceeding" as the statute requires. Counsel were permitted to produce evidence according to the dictates of statute and to argue the entire record as it related to punitive damages. The jury verdict, however, would not have been aided by financial evidence since the conclusion was that plaintiffs were not entitled to such damages.

## IV.

■ Plaintiffs' motion to release exhibits from protective order is denied.

All of the protected exhibits were used at public trial of this cause; afterwards the exhibits were returned to the party who produced them. This was done because the sheer volume of exhibits made a storage problem for the Clerk of Court and because copies of each party's exhibits had been furnished to their opponents. Thus, although they were used at trial, such exhibits did not enter the public record as it existed following the trial.

*Jochims v. Isuzu Motors, Ltd.*, 151 F.R.D. 338, 340 (S.D.Iowa 1993), is a well-reasoned case providing insight into the disposal of plaintiffs' motion. There, the court held that although the trial record had not been sealed, there was no common law right of access to confidential documents used at trial. *Id.* Acting under the court's supervisory power over its own records and files, the court must exercise sound discretion in determining whether to seal or not. *Id.* The trial judge has the obligation to override any public access where disclosure would harm a litigant's competitive standing. *Id.* at 341. The court then held that the confidential documents, which by their description were nearly identical to those at issue here, continued in their protected status. *Id.* "In making this determination, this court is mindful of the need to balance the competing interests

involved, and to make this determination in light of the facts and circumstances of this particular case." *Id.* at 341. Finally, the right of the public to access does not override the interests of the defendant in maintaining confidentiality to its documents. *Id.* at 341–42. "[T]he public good would be substantially disserved if the introduction of a document in a civil trial deprived it of its otherwise confidential status." *Id.* at 342.

Much the same situation confronting the court in *Jochims* exists here. All of the documents were produced pursuant to protective order which contemplated use of such documents at trial without loss of their confidentiality. Plaintiffs did not timely dispute whether any of the produced documents were truly confidential and as such subject to the protective order. This court notes that during the trial these documents were regarded by all parties as confidential, sensitive information, and by implication agreed that the untoward release of them had the potential to harm defendants. Finally, the confidential documents are not now part of the public record; the continued treatment of the documents as confidential will not impose a burden upon any party to this action.

For these reasons, the Protective Order previously entered by the court remains in effect and shall continue to remain in effect.

## V.

■ Defendants' motion for interview of the trial jurors is denied. Standing Order number 7 of the District of Montana requires counsel to move the court for permission to interview jurors after trial. Such interviews will be granted only upon movant's showing of good cause. Good cause is lacking here. The thrust of the questions proposed by defendants is whether individual jurors recall seeing the words "driver unbelted," their understanding of those words, and whether an instruction would have erased that knowledge from their minds.

There is no need for the jurors to answer the proposed questions because a complete record of the court proceedings exists. Seatbelts had been excluded as an issue in this case because of section 61–13–106 of the Montana Code.[2] When the offending exhibit

**2.** Full text of this statute included *infra.*

was produced by defendants, the court determined that defendants violated the explicit directions and warnings about seatbelt evidence. The court determined that the production of the offending exhibit was at least gross negligence and that it placed before the jury evidence which had been precluded. The effect of producing this evidence was to deprive plaintiff of a fair trial, that is a trial void of the precluded issue.

The plaintiffs' motion following the production of such evidence was either for a mistrial or to strike out the defenses. The court declined to permit voir dire of the jury at that time because to do so would only serve to highlight the offending evidence. In other words, while it may have been interesting to record knowledge gleaned from the offending exhibit by the jury, any such questioning would have further prejudiced the plaintiffs' presentation of their case. Regardless of the results of such questioning, and having again paraded the seatbelt issue before the jury, the court would have then been restricted to but one remedy, and that would be a mistrial. The defendants created the situation, and should not now be permitted to second guess the effect their wrongdoing had upon the jury, nor restrict the remedies the court might apply.

Finally, the court concluded that a curative instruction would not suffice. Any such instruction would merely serve to exacerbate the situation and confuse the jury. It would again parade an issue which had been ruled inadmissible before them, which this court is convinced is exactly what the defendants wanted to do. The curative instruction would amount to giving a party bonus points for wrongdoing.

## VI.

Defendants' renewed motion for judgment as a matter of law or for a new trial is denied.

Defendants contend a new trial is warranted pursuant to Rule 59(a), Federal Rules of Civil Procedure, because the verdict is contrary to the evidence and on the following other grounds:

a. The trial court improperly excluded evidence, offered to prove injury and accident causation, that Mrs. Livingston did not use her seat belt;

b. The trial court improperly sanctioned Isuzu for violating the trial court's order in limine prohibiting discussion that Mrs. Livingston did not use her seat belt;

c. The jury verdict is inconsistent and perverse;

d. The trial court's submission of plaintiff's failure-to-warn claim constitutes clear error;

e. The trial court's submission of the issue of punitive damages to the jury was contrary to the evidence and constitutes error;

f. The trial court improperly admitted into evidence irrelevant and unfairly prejudicial evidence; and

g. The trial court improperly excluded relevant probative evidence offered by Isuzu.

h. The trial court improperly refused to allow Isuzu to argue and the jury to consider the reconstruction evidence provided by Michael Holcomb.

i. Plaintiffs failed to submit a prima facie case and Isuzu is entitled to judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.

Additionally, defendants renew their motion for judgment as a matter of law pursuant to Rule 50(b), Federal Rules of Civil Procedure. Defendants contend plaintiffs failed to establish a prima facie case and plaintiffs provided insufficient evidence from which a reasonable juror could conclude that:

a. Isuzu failed to exercise due care in its testing of the Trooper;

b. The Isuzu Trooper was negligently designed;

c. Isuzu failed to exercise due care regarding the content of the visor label when that visor label contained the precise language approved by the Federal Government in 49 C.F.R. 575.105; and

d. The alleged negligent design, negligent testing, or negligent failure to warn caused plaintiff's accident.

These motions, and the grounds upon which they are based, will be addressed in turn.

*Motion for a New Trial*

■ "The grant of a new trial is 'confided almost entirely to the exercise of discretion on the part of the trial court.'" *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir.1990) (*quoting Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 190–91, 66 L.Ed.2d 193 (1980)). A trial court should order a new trial where the verdict is contrary to the clear weight of the evidence or to prevent a miscarriage of justice. *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir.1957), *cert. denied*, 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074 (1958).

a. *The trial court properly excluded evidence, offered to prove injury and accident causation, that Mrs. Livingston did not use her seat belt*

■ Defendants argue this court erred in precluding, in an order in limine, all reference to seat belts pursuant to section 61–13–106 of the Montana Code. Defendants, citing *Califato v. Gerke*, 258 Mont. 68, 852 P.2d 121 (1993), contend the statute does not prohibit all references to seat belts, but only evidence of a violation of the mandatory seat belt law found at section 61–13–103. Defendants argue that evidence of Elizabeth Livingston's failure to use a seat belt was admissible to show causation of the accident because she drove off the road while attempting to buckle her seat belt and to prove causation of her injuries because she was ejected from the vehicle.

Defendants' arguments are without merit. In 1980, in *Kopischke v. First Continental Corp.*, 187 Mont. 471, 610 P.2d 668 (1980), the Montana Supreme Court held that since no statutory duty existed to wear a seatbelt, failure to use one that was available was not admissible to prove contributory negligence by an injured driver. The court held that section 61–9–409 of the Montana Code, which required that vehicles manufactured after 1966 be equipped with seatbelts and that those vehicles not be operated unless the belts remained installed, did not require the driver to use the seatbelt.

The Montana Legislature, in 1987, created a statutory duty to use seatbelts in enacting the "Montana Seatbelt Use Act." *See* Mont. Code Ann. §§ 61–13–101 to –106. Section 61–13–103 requires that no driver may operate a motor vehicle unless each occupant in certain designated seats is wearing a seatbelt. However, section 61–13–106 provides that:

> Evidence of compliance or failure to comply with 61–13–103 is not admissible in any civil action for personal injury or property damage resulting from the use or operation of a motor vehicle, and failure to comply with 61–13–103 does not constitute negligence.

Mont.Code Ann. § 61–13–106.

Defendants' reliance on *Califato* is misplaced. In *Califato*, plaintiff suffered injury while driving defendant's vehicle. The Montana Supreme Court held admissible evidence that plaintiff was not wearing a seatbelt because the seatbelt had been rendered inoperable by defendant. The court determined its holding was consistent with its holding in *Kopischke* and with section 61–13–106 because plaintiff in *Califato* did not wear a seatbelt at the time of his accident "because the seatbelt had been rendered inoperable and was unavailable for his use." *Califato*, 852 P.2d at 123. In other words, the court allowed evidence of plaintiff's failure to use a seatbelt because his failure resulted from an affirmative act by defendant to make the seatbelt unusable in violation of section 61–9–409.

The facts from *Califato* are in stark contrast to the facts in the case now before the court. The question here is not whether defendant made the seatbelt unavailable for use in violation of section 61–9–409. Rather, the question is whether evidence is admissible regarding Elizabeth Livingston's use or failure to use a seatbelt. Clearly, evidence related to this question is not admissible given section 61–13–106 of the Montana Code. To hold otherwise would require complete disregard for the statute and a reckless reading of *Califato*.

b. *The trial court properly sanctioned Isuzu for violating the trial court's order in limine prohibiting discussion that Elizabeth Livingston did not use her seat belt*

■ Defendants argue the court erred in precluding presentation of defendants' de-

fenses as a sanction for violation of the order in limine prohibiting evidence of whether Elizabeth Livingston was wearing a seatbelt. Defendants assert the sanction violates their constitutional rights of due process and equal protection and was inappropriate considering defendants' "inadvertent" display of the exhibit containing the offending language. The thrust of defendants' argument is that the sanction actually rose to the level of a dismissal or default judgment in favor of plaintiffs and this was too severe a penalty given defendants' lack of willfulness or bad faith in violating the court's order in limine.

■■■■ "The inherent powers of federal courts are those which 'are necessary to the exercise of all others,'" and include "the 'well-acknowledged' inherent power ... to levy sanctions in response to abusive litigation practices." *Fjelstad v. American Honda Motor Co., Inc.,* 762 F.2d 1334, 1338 (9th Cir.1985) (*citing Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764–65, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980), *quoting United States v. Hudson* 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812)). The Ninth Circuit Court of Appeals has held that:

> [C]ourts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice. Due process limits the imposition of the severe sanctions of dismissal or default to extreme circumstances in which the deception relates to the matters in controversy and prevents their imposition merely for punishment of an infraction that did not threaten to interfere with the rightful decision of the case.

*Fjelstad,* 762 F.2d at 1338 (citations and emphasis omitted).

■■■■ In determining whether dismissal or default is an appropriate sanction for violation of a court order, courts are called upon to weigh five factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the opposing party; (4) the availability of less drastic sanctions; and (5) the public policy favoring disposition of cases on their merits. *See Malone v. United States Postal Service,* 833 F.2d 128, 130 (9th

Cir.1987), *cert. denied,* 488 U.S. 819, 109 S.Ct. 59, 102 L.Ed.2d 37 (1988); *Thompson v. Housing Authority of the City of Los Angeles,* 782 F.2d 829, 831 (9th Cir.), *cert. denied,* 479 U.S. 829, 107 S.Ct. 112, 93 L.Ed.2d 60 (1986).

In the instant case, it is worth noting from the outset that this court's sanction of striking defendants' defenses falls short of the severity of the sanctions of dismissal or default. While this court is mindful of the seriousness of the sanction imposed, precluding defendants' defenses did not amount to a default. As the record illustrates, defendants were allowed to proceed to the settlement of jury instructions and offer their closing arguments to the jury. The record provides, in pertinent part:

Mr. Kelly:[3] The court has indicated that we may argue that plaintiffs have not proven their case against Isuzu.

The Court: I'm using that as an illustration. You can argue the record, is what I'm staying [sic].

Mr. Kelly: Yeah. The Court has—it is not clear to me, however, what the Court is going to say the Court has done and if the Court has ruled that we are liable for the injuries. Is that not going to occur?

The Court: I believe the proper way of presenting this is there was a demand for jury, there is a jury. We submitted on what record there is to the jury under the usual instructions of the court and you submitted them and we'll settle them. They'll get the theories and they'll have the right of—Mr. Kelly, they can come back and say the plaintiff has not proven this case and hurt their case.

. . . .

Mr. Kelly: And on the basis of the record it would be the same—almost the same, I suppose, if I can get the Court's guidance, in some cases where the defense believes the plaintiff does not prove their case and has done such a good job on cross-examination that they simply don't call any witnesses and it would be in effect that.

---

3. Counsel for defendants, along with Mr. Schultz.

The Court: I would think that would be the state of the record.

Additionally, Mr. Kelly stated in his closing argument that:

Isuzu has shown that this case really ended for the plaintiffs with the testimony of Officer Dan Smith. Of all the witnesses in this case, Officer Smith's testimony is one that was not mentioned by plaintiffs' counsel in his closing statement, and for good reason. After Officer Dan Smith's testimony this case doesn't really need any other witnesses.... Now, based on all of the evidence that was disclosed during the plaintiffs' case, Isuzu has proven that plaintiffs have failed to prove their case. The right result here is so obvious that it's not necessary for Isuzu to add more evidence after the testimony of Officer Smith. The right result is as plain as day and it has been from the time of his testimony.

It is equally worth noting that the cases discussing sanctions, cited *supra*, deal primarily with abusive discovery practices. The incident giving rise to the sanction in the instant case was not abuse of discovery, but rather violation of the court's order in limine, during direct examination of defendants' witness within defendants' case-in-chief, on the eighth day of a jury trial. The prejudicial effect to plaintiffs of the violation of the order was, and is, incalculable. Moreover, the violation of the order was in direct contravention to section 61–13–106 of the Montana Code, as discussed *supra.*

With that in mind, even considering the analysis set out *supra* for the appropriateness of the sanction of dismissal or default, defendants' gross negligence in offering the exhibit with the words "Driver–Unbelted" emblazoned upon it properly forms the basis upon which this court imposed the sanction of precluding all defenses. For purposes of this motion, this court will discuss the five factors, set out *supra,* to be weighed in determining the appropriateness of a dismissal or default sanction as those factors relate to the sanction imposed in this case.

1. *The public's interest in expeditious resolution of litigation*

 and

2. *The court's need to manage its docket*

These two factors support the sanction imposed. Defendants' gross negligence in displaying the offending exhibit greatly impeded resolution of the case because of the prejudicial effect the act had on plaintiffs. *See Malone,* 833 F.2d at 131. This court clearly precluded the mention of seatbelts in its order in limine pursuant to section 61–13–106 of the Montana Code because such evidence "is not admissible in any civil action for personal injury or property damage" and failure to use a seat belt "does not constitute negligence." Mont.Code Ann. § 61–13–106. Absent the sanction imposed, defendants' violation of the order on the eighth day of a trial set for approximately ten days would have prevented this court from adhering to its trial schedule.

3. *The risk of prejudice to the opposing party*

■ In deciding whether a party has been prejudiced by an opposing party's actions, courts are to look at whether the actions "threaten to interfere with the rightful decision of the case."[4] *Malone,* 833 F.2d at 131 (*citing Rubin v. Belo Broadcasting Corp.,* 769 F.2d 611, 618 (9th Cir.1985)).

The risk of prejudice to plaintiffs because of defendants' display of the words "Driver–Unbelted" before the jury is clear. Defendants' action, as already stated, violated an order in limine and Montana's Seatbelt Use Act. Plaintiffs did not raise the issues of crash worthiness of the vehicle or adequacy of the seatbelt. Therefore, mention to the jury of Elizabeth Livingston's failure to use a seatbelt improperly put before it the issue of contributory negligence. Clearly, this action and result threatened to interfere with the rightful decision of the case.

■ Additionally, whether the action results in prejudice sufficient to warrant a sanction is determined in part by reference to the offending party's excuse for the action.

---

**4.** The other inquiry here is whether the actions impair the party's ability to go to trial. Since this infraction occurred during trial, this inquiry is not helpful.

*Malone,* 833 F.2d at 131 (*citing Nealey v. Transportacion Maritima Mexicana, S.A.,* 662 F.2d 1275, 1280 (9th Cir.1980)). Here, defendants characterize their action of displaying the offending exhibit as an "inadvertent and momentary reference to [an] obvious fact."[5] Moreover, defendants contend that the court reserved ruling on the motion in limine until trial and that, technically, no order in limine existed.

In contrast to defendants' characterization of their action, this court characterized the act as "gross negligence," especially given the late date of the infraction and the ample time available to prepare exhibits and witnesses before trial. While gross negligence "falls short of being such reckless disregard of probable consequences as is equivalent to a wilful and intentional wrong," it is still defined as "intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another." **Black's Law Dictionary** 1033 (6th ed. 1990). Given this court's finding of gross negligence, defendants' excuses of inadvertence and a momentary reference to a already obvious fact are not reflected in the record.

Furthermore, defendants' argument that they were uncertain of the court's ruling in limine on the seatbelt issue is meritless. Defendants have conceded throughout their briefs that they were adamant in complying with the court's order by discussing with witnesses their inability to testify about seatbelts and their scrutiny of exhibits to ensure they did not contain references to seatbelts. Additionally, the record reflects repeatedly this court's position on the motion. For example, this court noted, in response to plaintiffs' renewed motion in limine to exclude mention of seatbelts by defendants' witness Stalnaker, as follows:

> If that occurs, counsel, the clouds over Montana are going to open up. Because I

ruled all the way through it's inadmissible on the current record. It's inadmissible. Counsel know it and if the inference is made, it will be stricken. I'm restrained to let [Dr. Stalnaker] testify and I'm not going to stop him. . . .

This court's finding of gross negligence on the part of defendants, as well as the record's clarity regarding the order in limine, result in the conclusion that defendants' excuses for their action are groundless. Defendants' violation of the order in limine threatened to interfere with the rightful decision of the case and worked extreme prejudice upon plaintiffs.

### 4. *The availability of less drastic sanctions*

The Ninth Circuit Court of Appeals has held that a district court "abuses its discretion if it imposes a sanction of dismissal [or default] without first considering the impact of the sanction and the adequacy of less drastic sanctions." *Malone,* 833 F.2d at 131 (*quoting United States v. National Medical Enterprises, Inc.,* 792 F.2d 906, 912 (9th Cir. 1986)). While the court has stated it prefers explicit discussion of alternative sanctions, *Malone,* 833 F.2d at 132,[6] it has not held that explicit discussion of alternative sanctions is required for the sanction to be upheld. *Id.* A list of alternative sanctions includes:

> a warning, a formal reprimand, placing the case at the bottom of the calendar, a fine, the imposition of costs or attorney fees, the temporary suspension of the culpable counsel from practice before the court, . . . dismissal of the suit unless new counsel is secured[,] . . . preclusion of claims or defenses, or the imposition of fees and costs upon [ ] counsel.

> • • • • •

*Id.* at 132 n. 1 (*quoting Titus v. Mercedes Benz of North America,* 695 F.2d 746, 749 n. 6 (3d Cir.1982)).[7]

---

5. The "fact" defendants find "obvious" is apparently their contention that Elizabeth Livingston was not wearing a seatbelt at the time of the rollover. It is certainly arguable that the jury may not have found that fact as obvious as defendants found it prior to the display of exhibit 592. It is also arguable that the jury more easily found the fact "obvious" after defendants displayed the words "Driver–Unbelted" on their poster-sized exhibit.

6. *Citing People v. Reyes,* 800 F.2d 940, 944 (9th Cir.1986) and *Rubin v. Belo Broadcasting Corp.,* 769 F.2d 611, 617 (9th Cir.1985).

7. As noted *supra,* preclusion of defenses is not equivalent to dismissal or default, but rather may be characterized as an alternative sanction, short of dismissal or default. *Malone,* 833 F.2d at 132; *Titus,* 695 F.2d at 749 n. 6.

In the instant case, this court considered and rejected alternative sanctions for violation of the order in limine. First, defendants suggested the court conduct a limited voir dire of the jury to determine how many, if any, of the jurors saw the offending language. This court rejected that suggestion on the record and stated the reasons as follows:

... I'm going to tell you that counsel asked me to question, voir dire the jury as to what they saw. I will not do so because to do so will only drive this question deeper into their minds. It was in plain view for a period of my estimate is two or three minutes. It may have been slightly more, slightly less, but in plain view of the jury for that period of time. And any further emphasis of this point is just simply going to drive it in.

Trial transcript, p. 1930.

Second, defendants suggested that a curative instruction should have been given to the jury. For the same reasons this court decided not to conduct a voir dire of the jury, a curative instruction was not given. To have done so would have served only to further emphasize the seatbelt issue and cause more prejudice to plaintiffs. This court responded, on the record, to that suggestion as follows:

So the question in my mind then became, Well, should I back up and give them some kind of a warning? I am convinced at this point that a warning would be useless, because the issue is a conscious word rather than an unconscious one to the jurors and it's going to stay with them and I believe that it's of the magnitude that it would influence a verdict in this case.

. . . .

[S]ince I believe that the seatbelt was injected by the defendants and I believe that it was done to at least back door a defense that was not otherwise available to them, I proceeded in the manner that I did.... I thought, Can I cure this by an instruction or a questioning of the jury? And I don't think it's the kind of issue that [in] this kind of case I can do so.... The injection of this issue, [to the] best of my recollection, in my mind, [is] one that is going to stay with the jury regardless of admonitions, and I just believe that if I poll the jury, if I try to in any other manner erase, through instructions erase the issue, that I simply have done a terrible disservice.

Trial transcript, p. 2019, 2021–22.

Finally, upon suggestion by defendants, this court considered whether a mistrial should have been declared and a new trial ordered as an alternative sanction. Again, this court reasoned that a mistrial and new trial would not adequately remedy defendants' prejudicial action. This court addressed this suggestion on the record as follows:

In my searching for this [suggestion of a] new trial, I've considered where we're at in the trial. We have put eight days of time into this trial so far and they've been eight full days. I've kind of kept the trial moving through long hours and the only reason I did so is that it's June in Montana and I know how long I can hold a jury, and I did put a time limitation on the case. I did note the cost of bringing witnesses. I haven't heard much about the wealth of the plaintiff, but I've heard an awful lot about expense and I've heard an awful lot about the terrible expense of bringing witnesses as several hundred dollars an hour to testify in this case. It seems wrong to start over, to go through and to make that kind of expense and to keep this case from its resolution.... I'm manifestly aware these days of the cost of delay and I deemed the cost of delay and a new trial as deemed prohibitive, not only from the standpoint of cost but from the standpoint of resources.

Trial transcript, p. 2020–21.

Moreover, to have declared a mistrial and ordered a new trial would have caused plaintiffs to suffer additional prejudice. Even if costs of the trial to the time of the violation had been assessed against defendants, plaintiffs would suffer the prejudice of having their case-in-chief fully exposed to defendants' scrutiny without having an equal opportunity to observe and evaluate defendants' case. While this prejudice is not subject to quantitative measurement, it would appear severe given the length of plaintiffs' case-in-chief, the complexity of the evidence presented, and the factual and legal issues involved.

As indicated by the discussion *supra*, this court considered the impact of the sanction imposed and the adequacy of less drastic sanctions in this case. The sanction imposed of precluding defendants' defenses did not amount to a dismissal or default in favor of plaintiffs. The sanction was one less drastic than dismissal or default and better tailored to the circumstances present than those suggested by defendants.

5. *The public policy favoring disposition of cases on their merits*

As the Ninth Circuit Court of Appeals noted in *Malone*, this fifth factor weighs against dismissal. *Malone*, 833 F.2d at 133 n. 2. However, it is not sufficient enough to outweigh the previous four factors if they support dismissal. *Id.*

Here, as noted repeatedly, the sanction imposed, while harsh, is not as severe as outright dismissal or default. Also, the four factors discussed above support this court's decision to preclude defendants' defenses. Moreover, since the sanction imposed was not a dismissal or default in favor of plaintiffs and the case was presented to the jury after closing arguments, and jury instructions on the record as it existed, the case was decided on its merit.

In imposing the sanction herein, this court considered the five factors outlined by the Ninth Circuit. The prejudicial effect upon plaintiffs' case and the extent of resources expended, both by the parties and the court, form a sound basis upon which this court relied in sanctioning defendants by precluding their defenses.

c. *The jury verdict is not inconsistent or perverse*

■ Defendants argue that they are entitled to a new trial because the jury rendered an inconsistent verdict when it found defendants negligent for their "design, testing or failure to warn," but did not find the vehicle defective. Defendants argue that in order to find negligence in designing, testing, or failing to warn, the jury had to find the vehicle defective.

■ "When faced with a claim that verdicts are inconsistent, the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to disregard the jury's verdict and remand the case for a new trial." *Toner v. Lederle Laboratories*, 828 F.2d 510, 512 (9th Cir.1987) (*citing Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 666, 9 L.Ed.2d 618 (1963)), *cert. denied*, 485 U.S. 942, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988). "The consistency of the jury verdicts must be considered in light of the judge's instructions to the jury." *Id.* (*citing Gallick* 372 U.S. at 120–21, 83 S.Ct. at 666–67).

At trial, this court gave jury instructions that state, in pertinent part:

Plaintiffs have alleged two different legal theories of fault on the part of the Defendants. One theory is "negligence" and one is "strict liability." I will instruct you about what Plaintiffs must prove as to each of these separate theories.

Every person is responsible for injury to the person or property of another, caused by his or her negligence.

Negligence is the failure to use reasonable care. Negligence may consist of action or inaction. A person is negligent if he fails to act as an ordinarily prudent person would act under the circumstances.

In respect to Plaintiffs' claim that Defendants were at fault under the negligence theory, the Plaintiffs must prove one of the three following acts of negligence by a preponderance of the evidence:

(1) The Defendants were negligent in:

(a) Failing to design and manufacture the Trooper II so that it would perform in a reasonably safe manner under foreseeable driving circumstances.

(b) Failing to adequately test the rollover characteristics of the Trooper II.

(c) Failing to adequately warn of the unreasonably dangerous rollover characteristics of the Trooper II.

The instructions go on to state the elements of negligence and then outline the requirements for plaintiffs to prevail on their strict liability theory, in part as follows:

In order to recover under a strict liability theory, the plaintiffs must prove these elements as to any such claim:

(1) That the defendants manufactured and sold an Isuzu Trooper II which at the time defendants manufactured and sold it was in a defective condition unreasonably dangerous to the consumer or user;

(2) That the said Isuzu Trooper II was expected to and did reach the ultimate consumer without substantial change in the condition in which the defendants had it; and

(3) That the defective condition in the said Isuzu Trooper II proximately caused injury to the plaintiffs.

■ Here, the question is whether, under Montana law, it is consistent for the jury to find defendants negligent in designing, testing, or failing to warn, while at the same time finding the vehicle not defective and defendants not strictly liable. The Ninth Circuit Court of Appeals has given federal trial courts the following guidance in interpreting state law:

When interpreting state law, a federal court is bound by the decision of the highest state court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.

*Security Pacific Nat'l Bank v. Kirkland,* 915 F.2d 1236, 1238–39 (9th Cir.1990) (citations omitted).

The Montana Supreme Court has not spoken on the specific question presented here. Moreover, Montana has no intermediate appellate court. Therefore, this court must look to other sources to try to predict how the Montana Supreme Court would decide the issue.

Courts will usually vacate a judgment and order a new trial if a jury's special verdicts are irreconcilably inconsistent with each other or with the general verdict. *See generally* John E. Theuman, Annotation, *Products Liability: Inconsistency of Verdicts on Separate Theories of Negligence, Breach of Warranty,* or Strict Liability, 41 A.L.R.4th 9, 13 (1985) [hereinafter *Products Liability* ] (reviewing and discussing cases from various jurisdictions that address seemingly inconsistent verdicts in products liability actions). However, courts will vacate a judgment and order a new trial only with the "greatest reluctance" and will search for any "rational, nonspeculative interpretation which can reconcile an apparent inconsistency." *Id.* "[S]ince the elements of the negligence, . . . and strict liability causes of action are generally regarded as being at least slightly different, such a reconciliation may not be difficult in some cases." *Id.*

The Ninth Circuit Court of Appeals has addressed the issue. In *Toner v. Lederle Laboratories,* the plaintiff was paralyzed after being vaccinated with Tri–Immunol, a drug manufactured by the defendant. The plaintiff contended that the defendant failed to develop and market Tri–Slogen, an alternative vaccine apparently safer than the one given to the plaintiff. The jury returned a special verdict finding the defendant negligent in connection with the product and that the negligence caused the plaintiff's injuries. The jury also rejected the plaintiff's other theories of strict liability and breach of warranty. The defendant appealed arguing, inter alia, that the jury's special verdicts finding the defendant negligent, but not strictly liable, were inconsistent. *Toner,* 828 F.2d at 511.

The Ninth Circuit certified questions of state law to the Idaho Supreme Court.[8] Based on the answers it received, the court found the jury's special verdict answers not inconsistent. *Toner,* 828 F.2d at 511. Specifically, the court interpreted the Idaho Supreme Court's statement that "the focus in negligence is on the manufacturer's conduct, while in strict liability it is on the product and the user's expectations," as allowing the jury to find defendants negligent, but not strictly liable. *Id.* at 513. The Ninth Circuit determined from the supreme court's answers that even though a cause of action

---

**8.** Basically, the questions dealt with Idaho's view of the "unavoidably unsafe product" defense set out in comment k to section 402A of the Restatement (Second) of Torts. The Idaho Supreme Court answered that Idaho accepted the defense in strict liability actions, but that position still allows plaintiffs to proceed under a negligence theory even though comment k provides a defense to strict liability. *Toner,* 828 F.2d at 511–12.

under a strict liability theory may fail, there still exists an "incentive for safe design by the manufacturer that is supplied by the threat of negligence liability." *Id.* (*citing* the supreme court's opinion in response to the certification, *Toner v. Lederle Laboratories,* 112 Idaho 328, 732 P.2d 297, 310 (1987)). The court noted that:

> It is not enough for Lederle to argue that the jury's finding of negligence concludes that Tri–Immunol was defective, while its finding on strict liability states a contrary view. The law and the instructions required the jury to examine the case from two different points of view. It is reasonable to read the special verdicts as saying that Lederle's failure to develop the Tri–Slogen vaccine was unreasonable conduct, although the danger posed by the product itself was not greater than an ordinary consumer would reasonably expect.

*Id.*

While the facts of *Toner* are not precisely analogous to those in the instant case, the analyses followed by the Ninth Circuit, the Idaho Supreme Court, and other courts are instructive in predicting the course the Montana Supreme Court would take in addressing this issue. *See, e.g., Products Liability* and some of the cases cited therein: *Perry v. Red Wing Shoe Co.,* 597 So.2d 821 (Fla.Dist. Ct.App.1992) (finding jury's rejection of strict liability claim not inconsistent with negligence finding where jury could reasonably find from evidence that defendant failed to warn product purchasers about product and this failure was proximate cause of plaintiff's injuries); *Eagle–Picher Industries, Inc. v. Balbos,* 84 Md.App. 10, 578 A.2d 228 (1990), *rev'd in part on other grounds,* 326 Md. 179, 604 A.2d 445 (1992) (holding jury's finding that defendants' products were not unreasonably dangerous, but that defendants were negligent in not warning about dangers involved with product not inconsistent); *Hasson v. Ford Motor Co.,* 19 Cal.3d 530, 138 Cal.Rptr. 705, 564 P.2d 857 (1977), *overruled on other grounds by Soule v. General Motors Corp.,* 8 Cal.4th 548, 34 Cal.Rptr.2d 607, 882 P.2d 298 (1994), (finding that all parties, and the jury, understood that negligence and strict liability claims were independent of each other and that the finding of a defect was not essential to determine liability on all

counts); *Sterner v. U.S. Plywood–Champion Paper, Inc.,* 519 F.2d 1352 (8th Cir.1975) (apparently applying Iowa law and holding the verdict not inconsistent because the jury could have determined the product was fit for its intended use as long as the manufacturer gave proper warnings about the products dangers); *Wagner v. International Harvester Co.,* 611 F.2d 224 (8th Cir.1979) (applying Minnesota law and holding that special verdict finding no product defect was not inconsistent with concurrent verdict that manufacturer was negligent in its design, testing, or manufacture of product since the wording of concurrent verdict clearly suggested an alternative basis for finding negligence); *but cf. Products Liability* and cases cited therein holding the contrary.

In the instant case, this court gave the jury instructions delineating two distinct and separate causes of action. As noted *supra,* this court instructed the jury up front that plaintiffs alleged "two different theories of fault" against defendants. The instructions defined each theory and set out separately the proof necessary for plaintiff to prevail on each claim.

Included in the instructions on the negligence claim were three separate grounds for finding defendants negligent; failing to design and manufacture the vehicle so that it would perform in a reasonably safe way under foreseeable driving circumstances; failing to adequately test the rollover characteristics of the vehicle; and failing to adequately warn of the unreasonably dangerous rollover characteristics of the vehicle. The instructions for the negligence claim focused not on the product itself, but on the manufacturer's "action or inaction" in failing to use "reasonable care" or failing to act as an "ordinarily prudent person" under the circumstances. *See Toner,* 828 F.2d at 513.

The instructions regarding plaintiffs' strict liability claim involved whether the vehicle: was in a "defective condition unreasonably dangerous" to the consumer or user; was expected to and did reach the consumer without substantial change in its condition; and was in a defective condition that proximately caused plaintiffs' injuries. In contrast to the negligence claim instructions, these instruc-

tions focused on and emphasized the vehicle and its condition. *Id.*

As the Ninth Circuit concluded in *Toner*, plaintiffs may prevail on their negligence claim despite the failure of their strict liability claim because the jury could reasonably be expected to examine the case from two different points of view and reach its verdict based on the distinct focus of each cause of action. *Id.* It is reasonable to read the verdict as saying that the jury found defendants negligent for failing to adequately test the Trooper II and warn its users of the vehicle's danger of rolling over, while rejecting the claim that the Trooper II's dangerousness exceeded the reasonable expectations of an ordinary consumer.

This court must attempt to reconcile jury verdicts if there is a reasonable way to do so. *See Id.; Gallick*, 372 U.S. at 119, 83 S.Ct. at 666. Here, plaintiffs alleged the distinct and separate claims of negligence and strict liability. Given the different focus of each cause as emphasized in the jury instructions, this court finds the verdicts consistent and thus denies defendants' motion for a new trial.

d. *The trial court's submission of plaintiff's failure-to-warn claim does not constitute clear error*

■ Defendants contend they are entitled to a new trial because this court erroneously submitted plaintiffs' failure to warn claim to the jury. Relying on *Riley v. American Honda Motor Co., Inc.*, 259 Mont. 128, 856 P.2d 196 (1993), they argue the court should grant a new trial because neither Elizabeth Livingston nor any other witness testified at trial that she would have, or even might have, altered her conduct had she been given an adequate warning. Defendants thus argue that the record contains no evidence and permits no reasonable inference that inadequate warnings proximately caused plaintiffs' injuries.

■ "Montana law recognizes a failure to warn claim as a distinct cause of action under the theory of strict products liability." *Riley*, 856 P.2d at 198. A failure to warn claim under strict products liability requires that the plaintiff show:

1) The product was in a defective condition, "unreasonably" dangerous to the user or consumer;

2) The defect caused the accident and injuries complained of; and

3) The defect is traceable to the defendant.

*Emery v. Federated Foods, Inc.*, 262 Mont. 83, 863 P.2d 426, 431 (1993); *Riley*, 856 P.2d at 198; *Brown v. North Am. Mfg.*, 176 Mont. 98, 576 P.2d 711, 717 (1978). Also,

[a] product may be defective if purchasers and likely users have been misinformed or inadequately informed about either the risks or the dangers involved in the use of the product or how to avoid or minimize the harmful consequences from such risk.

*Emery*, 863 P.2d at 431 (*citing Streich v. Hilton–Davis*, 214 Mont. 44, 692 P.2d 440, 445–46 (1984)).

The thrust of defendants' argument is that Elizabeth Livingston did not unequivocally testify that an adequate warning "would have" altered her conduct and that she, therefore, failed to link the alleged inadequate warning with the rollover to show causation. Thus, they argue, she failed to make a prima facie case regarding her failure to warn claim.

This court disagrees. As the Montana Supreme Court noted in *Streich*, and later in *Emery*, plaintiffs may demonstrate the existence of a defective product if they had "been misinformed or inadequately informed about either the risks or the dangers involved in the use of the product or how to avoid or minimize the harmful consequences from such risk." *Emery*, 863 P.2d at 431; *Streich*, 692 P.2d at 445–46. While it is true that the record shows that Elizabeth Livingston read and understood the visor warning, it is equally true that she testified that the visor warning did not fully explain how the vehicle handled differently than other vehicles or exactly how the vehicle may roll over. Elizabeth Livingston's testimony regarding this proof is as follows:

Q. [By Mr. Crowley, plaintiffs' counsel]: Let's talk about the visor warning, does that talk about the rollover?

A. I don't believe so.

Q. Does it tell you specifically—the visor's in evidence, does it tell you what it means by an abrupt turn?

A. No.

. . . .

Q. Did the visor say anything about off-road hazards?

A. Not to my recollection.

Also, Elizabeth Livingston testified that she did not recall any information in the vehicle's owner's manual that discussed the rollover possibilities. Her testimony regarding this proof is as follows:

Q. . . . . Do you recall anything in the owner's manual that specifically talked about an enhanced hazard of rollover off road?

. . . .

A. I don't recall any text on that matter.

Q. Do you recall any text at all about how you should drive off road to prevent rollover?

A. I don't.

Q. Do you recall at all any text about how quickly this vehicle might roll over if you made the wrong move at the wrong time?

A. I don't.

While it is true, as defendants contend, that the Montana Supreme Court determined the plaintiff in *Riley* only said he "might have," rather than "would have," altered his conduct had a warning been given, and that this precluded his claim under strict liability from reaching the jury, such is not the case here. Elizabeth Livingston indicated through her testimony that the warning did not adequately instruct her on the vehicle's driving characteristics or rollover potential. This evidence was substantial enough to warrant sending the question of adequate warning to the jury. Therefore, defendants' motion for a new trial on this issue is denied.

e. *The trial court's submission of the issue of punitive damages to the jury was not contrary to the evidence and does not constitute error*

■ Defendants contend this court improperly submitted to the jury the issue of whether defendants acted with actual malice and whether plaintiffs were entitled to punitive damages. Defendants offer two argu-

ments in support of their motion for a new trial on this issue. First, they contend plaintiffs did not present sufficient evidence to warrant a jury instruction regarding actual malice. Second, they assert plaintiffs failed to introduce evidence in their case-in-chief regarding defendants' financial condition and plaintiffs, by this procedural failure, waived their opportunity to present the issue of punitive damages to the jury. Defendants contend that these occurrences "unfairly and prejudicially influenced the jury's deliberations on the questions of liability and the determination of compensatory damages."

Defendants' arguments are without merit. First, plaintiffs presented substantial evidence warranting the submission of the actual malice instruction to the jury. The record reflects plaintiffs met their threshold burden of producing clear and convincing evidence of actual malice on the part of defendants. For instance, plaintiffs' proof of negligence in Isuzu's designing of the Trooper II went not only to the issue of liability premised in negligence, but also to the issue of actual malice given the type of conduct alleged and the severity of its consequences. The same could be said for plaintiffs' negligence claim based on failure to warn of the Trooper II's rollover characteristics.

Second, Montana's law regarding punitive damages does not support defendants' arguments. The controlling law on punitive damages is set forth at section 27–1–221(6) and (7) of the Montana Code:

(6) Liability for punitive damages must be determined by the trier of fact, whether judge or jury.

(7)(a) Evidence regarding a defendant's financial affairs, financial condition, and net worth is not admissible in a trial to determine whether a defendant is liable for punitive damages. When the jury returns a verdict finding a defendant liable for punitive damages, the amount of punitive damages must then be determined by the jury in an immediate, separate proceeding and be submitted to the judge for review as provided in subsection (7)(c). In the separate proceeding to determine the amount of punitive damages to be awarded, the defendant's financial affairs, finan-

cial condition, and net worth must be considered.

*See also First Security Bank of Glendive v. Gary,* 245 Mont. 394, 798 P.2d 523, 527 (1990).

Here, after this court determined plaintiffs presented clear and convincing evidence from which the jury could infer defendants acted with actual malice, this court asked in the special verdict form whether defendants acted with actual malice. The jury responded affirmatively. At this point, pursuant to section 27–1–221(7)(a), this court conducted "an immediate, separate proceeding" discussing the amount of punitives, if any, for which defendants were liable. After hearing the evidence presented in this separate proceeding, the jury concluded that defendants owed no punitive damages.

Defendants' argument that the jury, in deliberating compensatory damages, was tainted by the instruction on actual malice and punitives is tenuous and highly speculative. The instructions clearly caution the jury against determining punitive damages at the time of deliberation regarding liability and compensatory damages, as follows: "You must not determine any amount of such punitive damage at this time but shall only answer question number 7 regarding actual malice." [9] Defendants have failed to show how they were prejudiced and are not entitled to a new trial on this basis.

### f. *The trial court properly admitted evidence*

Defendants contend that they are entitled to a new trial because this court erred in improperly admitting irrelevant and unfairly prejudicial evidence during plaintiffs' case-in-chief. Defendants argue that this improperly admitted evidence alone warrants the granting of a new trial, but also contend that this court's sanction precluding defendants' defenses "magnified" the prejudicial impact of the error.[10] Defendants note the following eight items of improperly admitted evidence:

1. Evidence of the Hooker–Kaplan tests.
2. Evidence of the proposed General Motors—Isuzu joint venture.
3. Evidence regarding Isuzu's practice of not retaining all of its raw test data.
4. Evidence of the computer simulation and accident reconstruction by Dr. Nalecz.
5. Evidence of the additional accident reconstruction disclosed on the eve of trial without allowing Isuzu to take additional discovery on this new work.
6. Evidence of Isuzu's advertising from the years 1985 through 1988.
7. Evidence regarding the NHTSA rollover docket.
8. Evidence regarding the handling characteristics of other vehicles.

This court will address these items in turn.

1. Evidence of the Hooker–Kaplan tests.

■ Defendants object to admission of plaintiffs' evidence regarding the opinions of Dr. Michael Kaplan and Robert Hooker. Kaplan and Hooker conducted comparison tests, involving the Isuzu Trooper II and the Jeep Wrangler and Cherokee, upon which they relied to form their opinions. The tests Kaplan and Hooker conducted demonstrated maneuverability and driving comparisons, related to rollovers, of the vehicles tested. Defendants contend this evidence is not admissible under Rules 401, 402, and 403 of the Federal Rules of Evidence because Kaplan and Hooker did not show that the tests were "substantially similar" to the accident forming the basis of this case.

■ As defendants correctly note, generally federal courts require "[a] showing of substantial similarity ... when a plaintiff attempts to introduce evidence of other accidents as direct proof of ... a design defect." *Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc.,* 23 F.3d 1547, 1555 (9th Cir. 1994) (*quoting Cooper v. Firestone Tire & Rubber Co.,* 945 F.2d 1103, 1105 (9th Cir. 1991)). Despite this requirement, courts have carved out exceptions. *See, e.g., Cooper,* 945 F.2d at 1105 ("evidence of dissimilar accidents may be admitted when relevant to the witness's credibility"); John W. Strong,

---

**9.** Question 7 states: "Did Plaintiffs prove by clear and convincing evidence that Isuzu Motors, Ltd. acted with actual malice."

**10.** Section VI.b. discusses this issue and this court will not add here to that discussion.

et al., **McCormick on Evidence** § 200 (4th ed. 1992) ("Of course, exactly identical circumstances cannot be realized and are not required.") (*citing Jones & Laughlin Steel Corp. v. Matherne,* 348 F.2d 394, 400–01 (5th Cir.1965) ("The differences between the circumstances of the accidents could have been developed to go to the weight to be given to such evidence"; defendant "had ample opportunity to explore these differences upon cross-examination or by its own witnesses.")). Also, "most courts recognize that the requirement is a relative one" and that provided "the obviously important factors are duplicated in the experiment, and if the failure to control other possibly relevant variables is justified, the court may conclude that the experiment is sufficiently enlightening that it should come into evidence." **McCormick on Evidence** § 202, p. 864 (citing cases).

In the instant case, the tests were videotaped from various angles and these tapes were shown to the jury at trial. The tests in no way attempted to duplicate the actual accident, nor were they represented to be duplicates of the accident. Rather, they were shown to demonstrate the rollover stability of the Isuzu Trooper II compared with similar sport utility vehicles of the same class. Thus, defendants' reliance upon authority calling for substantial similarity in the accidents is misplaced.

Moreover, as noted *supra,* other courts allow evidence of other accidents provided the differences in the accidents are put before the jury. Here, defendants had ample opportunity to cross-examine plaintiffs' witnesses on the tests and to point out the obvious differences between the actual accident and the videotaped recordings of the tests. Thus, because this evidence went to the potential defective condition of the Trooper II, it was admissible because its probative value outweighed the danger of unfair prejudice, confusion of the issues, or misleading of the jury.

 2. Evidence of the proposed General Motors–Isuzu joint venture.

█ Defendants contend this court erred in admitting evidence regarding a proposed joint venture involving Isuzu and General Motors (GM), including the admission of exhibits 43, 44, and 46. In 1986 and 1987, GM and Isuzu explored the possibility of a joint venture in which GM would sell the Trooper in the U.S. under GM's trademark. GM chose not to pursue the joint venture with Isuzu. Defendants argue that plaintiffs sought to suggest at trial that GM decided not to pursue the joint venture because of concerns regarding the Trooper's rollover resistance. This, defendants assert, amounted to unfair prejudice and the admission of irrelevant evidence.

The Eleventh Circuit Court of Appeal's discussion of this issue is instructive:

[R]elevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation. However, absolute certainty is not required. Expert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically. Whether this logical basis has been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility.

*Jones v. Otis Elevator Co.,* 861 F.2d 655, 662–63 (11th Cir.1988) (citations omitted).

Here, Dr. Kaplan did not testify as to his conclusion about why GM chose not to pursue to proposed joint venture with Isuzu. Rather, he expressed a reasonable conclusion about the content of, and communication regarding, the static rollover angle test and graph, as well as other data, contained in the exhibits. He testified that the information in exhibits 43, 44, and 46 indicated GM had concerns about the Trooper's safety as it related to rollover resistance.

Dr. Kaplan's testimony can reasonably be understood as an inference from the documents presented in the exhibits 43, 44, and 46. Also, defendants had the chance, on cross-examination, to attack any weaknesses in the bases upon which Dr. Kaplan relied in offering his conclusions. Moreover, Dr. Kaplan's testimony was relevant to the question of whether Isuzu had notice of the safety concerns surrounding the Trooper, given GM's concerns expressed during joint ven-

**1494**

ture discussions. The evidence was, therefore, properly admitted.

3. Evidence regarding Isuzu's practice of not retaining all of its raw test data.

■ Defendants contend this court erred in admitting evidence that Isuzu destroyed raw test data regarding the Trooper II. Defendants argue plaintiffs intended to use this evidence to suggest that Isuzu deliberately destroyed this information in bad faith and with intent to dispose of information unfavorable to Isuzu. Defendants argue that since this court ruled Isuzu's practice of destroying raw test data was not bad faith, the evidence was not probative and thus inadmissible.

■ Federal trial courts have the inherent discretionary power to rule on evidentiary questions involving the destruction of relevant evidence. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993). Trial courts also have "broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior." *Id.* (*citing Akiona v. United States*, 938 F.2d 158 (9th Cir.1991)). A finding of "bad faith," however, is not a prerequisite to admitting this evidence. *Id.* Simple "notice of 'potential relevance to the litigation'" will suffice. *Id.* (*quoting Akiona*, 938 F.2d at 161).

In the instant case, sufficient evidence existed that defendants knew or should have known of the importance of preserving the raw test data. Isuzu transferred some test results and conclusions from the raw data to summary reports, but without the raw data it is nearly impossible to verify the accuracy of the reports. Given Isuzu's knowledge of the Jeep CJ rollover problem in the U.S., as well as other information known industry wide involving the rollover factor in narrow track utility vehicles, Isuzu had notice of potential relevance to this and other litigation involving their product. Also, evidence of the destruction of the raw data is relevant when considering the accuracy and thoroughness of the summary reports compiled by Isuzu. The evidence was, therefore, properly admitted.

4. Evidence of the computer simulation and accident reconstruction by Dr. Nalecz.

■ Defendants argue this court erred in admitting evidence of computer-generated simulations of the accident by one of plaintiffs' expert witnesses. Defendants contend the simulations were neither scientific nor reliable.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court held that Rule 702, of the Federal Rules of Evidence, assigns the trial judge the task of ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at ——, 113 S.Ct. at 2795. The result of this is that "the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at ——, 113 S.Ct. at 2796.

In determining scientific knowledge, initial inquiries must be made regarding whether the reasoning or methodology behind the testimony is scientifically valid and whether the reasoning or methodology can be applied to the facts in issue. *Id.* The Supreme Court set out a partial list of factors trial judges are to look to in making these determinations, but they do not comprise "a definitive checklist or test." *Id.* The factors include: (1) whether a theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; [11] (3) the known or potential rate of error; and (4) general acceptance in the scientific community. *Id.* at —— – ——, 113 S.Ct. at 2796–97. The Court went on to note that "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one.... The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at ——, 113 S.Ct. at 2797.

---

11. The Court was quick to point out that "[p]ublication is not a sine qua non of admissibility; it does not necessarily correlate with reliability and in some instances well-grounded but innovative theories will not have been published. Some propositions, moreover, are too particular, too new, or of too limited interest to be published." *Daubert,* at ——, 113 S.Ct. at 2797.

In the instant case, Dr. Andrzej Nalecz testified at trial about a computer-generated accident simulation he developed for the case. As the record shows, he testified at length about the development and use of the Advanced Dynamic Vehicle Simulation (ADVS) over several years. Development of ADVS included work by several scientists processing and studying a wide variety of experimental vehicles, in various situations, equipped with sensors and data recorders. Dr. Nalecz testified at length about the complex process of putting various data, such as physics equations, vehicle dimensions, road conditions, and vehicle movements, into computers to reach a simulation of the events involved in the subject accident.

Dr. Nalecz covered the first factor, whether the theory can be or has been tested, in his testimony. He stated that the computer program is made up of various physical laws and equations commonly understood in science. Additionally, the program includes case-specific data including such things as the vehicle's characteristics and road conditions. The complexity of the mingling of this information precludes testing beyond verification of the data involved. Also, exact reenactment of the accident would not be practical or prudent. Thus, to the extent it can be, this court found the theory behind the computer simulation has been tested.

The second factor, whether the theory has been subjected to peer review, was similarly covered in Dr. Nalecz's testimony. Peer review of Dr. Nalecz's computer simulation methodology included several lectures and presentations to members of the scientific community, including automobile manufacturers and engineers. This clearly satisfies the second factor.

The third factor, the known or potential rate of error, is, again, difficult to gage given the complexity of the computer simulation. As Dr. Nalecz himself stated, "... I think we have perfection right now for the best existing technology and we're using the highest level technologies. You know, 50 years down the road, perhaps we can do better." While this does not give much insight to the potential rate of error, it is instructive regarding the question of what scientific methods are available and most reliable in accident simulation today. The correct treatment of the

evidence would not be to preclude it because of the uncertainty as to its rate of error, but rather to allow defendants the opportunity to cross-examine this witness and explore the possibilities and uncertainties regarding error. This court afforded defendants that opportunity and the evidence was properly admitted.

As to the fourth factor, general acceptance in the scientific community, a "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." *Daubert*, at ——, 113 S.Ct. at 2797 (*quoting United States v. Downing*, 753 F.2d 1224, 1238 (3d Cir.1985)). Here, Dr. Nalecz identified peers within his discipline who have worked with him and evaluated his work. He testified that he had presented his theories both in publications and lectures. Thus, the evidence satisfied the factor calling for general acceptance in the scientific community.

It is worth noting that in *Daubert*, the Court did not grant trial court judges carte blanche in admitting scientific evidence. Likewise, the Court offered this guidance to counsel once a trial judge has decided to permit scientific evidence: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at ——, 113 S.Ct. at 2798 (*citing Rock v. Arkansas*, 483 U.S. 44, 61, 107 S.Ct. 2704, 2714, 97 L.Ed.2d 37 (1987). The evidence here was properly admitted.

5. Evidence of the additional accident reconstruction disclosed on the eve of trial without allowing Isuzu to take additional discovery on this new work.

Defendants contend that a few weeks before trial, they were presented with computer simulations completely different from the ones they had received in February 1995 near the time they deposed Dr. Nalecz. They argue this data amounted to a "complete revision of all of [Dr. Nalecz's] work to date" and this court's refusal to preclude the

evidence "unduly hamper[ed] Isuzu in its ability to defend this case."

Plaintiffs' version of these events is, predictably, quite different. Plaintiffs allege that the new computer data they sent to defendants in May 1995 duplicated more than 90 percent of the computer data they provided in February, with the exception of twelve additional simulations. The first nine additional simulations dealt with and analyzed Mr. Holcomb's specific opinions regarding the initial speed of the Trooper II when it went off of the road. The tenth run changed the terrain of the ditch, to simulate smooth and dry pavement, to make it the best possible surface for the vehicle. Plaintiffs do not mention in their brief the content of the eleventh and twelfth runs, presumably because they make up the nearly ten percent difference from the first data supplied to defendants.

Despite a significant amount of cooperation, the protracted acrimony between the parties throughout this litigation resulted in various discovery disputes. This particular dispute was no more burdensome to the parties than any other. Given defendants' opportunity to review and evaluate more than 90 percent of the data presented from February to June of 1995 and the weeks between May and June to study the additional 12 runs in the simulation, this court finds their argument of being unduly hampered unpersuasive.

### 6. Evidence of Isuzu's advertising from the years 1985 through 1988.

■ Defendants contend this court erred in admitting evidence of Isuzu's advertising from 1985 through 1988. Defendants argue that because Elizabeth Livingston did not testify that she relied upon, or even saw, the advertisements, they are irrelevant to this case.

Defendants' argument is unpersuasive. Courts have held that a manufacturer's advertisements indicate a use of the product a manufacturer was able to foresee. *See, e.g., Hiller v. Kawasaki Motors Corp.,* 671 P.2d 369, 373 (Alaska 1983); *see also King v. Kayak Mfg. Corp.,* 182 W.Va. 276, 387 S.E.2d 511 (1989) (citing cases). That the advertisement was never seen by the party allegedly injured by using the product is irrelevant because " '[f]oreseeable use' in products liability cases focuses on what is foreseeable to the manufacturer, rather than on the subjective knowledge held by the consumer." *Hiller* 671 P.2d at 373; *see also King,* 387 S.E.2d at 522.

Here, whether Elizabeth Livingston saw the advertisements is irrelevant to the question of Isuzu's ability to foresee uses to which users would put the Trooper II. Thus, this evidence was probative of defendants' ability to foresee uses of the vehicle and was properly admitted.

### 7. Evidence regarding the NHTSA rollover docket.

Defendants contend that during the testimony of Dr. Michael Kaplan, this court erred in admitting evidence of National Highway Transportation Safety Administration (NHTSA) investigations related to the alleged rollover propensity of the Ford Bronco II, Suzuki Samurai, and Jeep CJ vehicles, as well as NHTSA proposed rulemakings on rollover prevention. Defendants argue this was error because the investigations and analyses conducted by NHTSA were based on evidence of other accidents involving other vehicles and that this was irrelevant to the instant action under Rule 402 of the Federal Rules of Evidence. Also, defendants assert, the NHTSA investigations, analyses, and reports were inadmissible hearsay.

■ Rule 402 of the Federal Rules of Evidence provides, in pertinent part, that "[a]ll relevant evidence is admissible." Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, the NHTSA reports of concerns regarding rollover characteristics of utility vehicles within the same class as the Trooper II are clearly relevant. The notices regarded the rollover resistance of motor vehicles and included information about statistics on serious injury and death connected with utility vehicle rollovers. This information was probative of defendants' knowledge of safety standards being developed for utili-

ty vehicles similar to the Trooper II. Its admission was proper on this basis.

 Plaintiffs do not dispute that these reports constitute hearsay. They argue, however, that Rule 803(8) of the Federal Rules of Evidence provides an exception permitting admission of the hearsay. This court agrees. Rule 803(8), describing types of hearsay not excluded by the hearsay rule, provides, in pertinent part:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or ... (C) in civil actions ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

 It is well-settled that administrative reports are admissible as "public records." *Beech Aircraft v. Rainey,* 488 U.S. 153, 161–62, 109 S.Ct. 439, 445–46, 102 L.Ed.2d 445 (1988). Even reports containing conclusions as opposed to mere factual recitations are admissible so long as the conclusions are factually based and trustworthy. *Id.* Reliability of public agencies usually conducting the investigations and "their lack of any motive for conducting the studies other than to inform the public fairly and adequately" make them admissible initially. *Ellis v. International Playtex, Inc.,* 745 F.2d 292, 301 (4th Cir.1984) (*quoting Kehm v. Procter & Gamble,* 724 F.2d 613, 618 (8th Cir.1983)). The party opposing admission has the burden of demonstrating that the report is not reliable. *Id.*[12] The court in *Ellis* explained assignment of the burden as follows:

> Placing the burden on the opposing party makes considerable practical sense. Most government sponsored investigations employ well accepted methodological means of gathering and analyzing data. It is unfair to put the party seeking admission to the test of "re-inventing the wheel" each time a report is offered. Rather than requiring the moving party to spend considerable time and money to ensure that the experts who conducted the study are available at trial, it is far more equitable to place that burden on the party seeking to demonstrate why a time tested and carefully considered presumption is not appropriate.

745 F.2d at 301.

Here, defendants point to no specific evidence of lack of trustworthiness regarding the subject reports, beyond their general allegation that the reports contain information gathered from the public by the NHTSA. Moreover, the record contains no evidence that would lead this court to doubt the reliability of the reports. Also, this court can conceive of no motivation for why the agency would conduct its studies or compile its reports in any way other than to help formulate policy to make vehicles less likely to roll over. This court is unpersuaded by defendants' contentions. The evidence was properly admitted.

8. Evidence regarding the handling characteristics of other vehicles.

 Defendants contend this court erred in admitting evidence offered by plaintiffs relating to the handling and stability characteristics of other vehicles, including the rollover and litigation history of the Jeep CJ–5 and CJ–7. Defendants argue that the evidence of the handling and stability characteristics of these Jeep models was not probative of the same characteristics of the Trooper II and should have been excluded. Any relevance this evidence may have, defendants argue, is outweighed by its unfair prejudice, tendency to cause confusion, and waste of time.

 Defendants, as one of their affirmative defenses, contended that the Trooper II complied with the state of the art design of sports utility vehicles at the time of its manufacture. In assessing a state-of-the-art defense, the trier of fact may consider the state of the art as it existed at the time. *Clarksville–Montgomery County Sch. Sys. v. U.S. Gypsum Co.,* 925 F.2d 993, 1005 (6th Cir. 1991) (holding jury instruction on state of the art defense proper); *see also George v. The*

---

**12.** For a thorough discussion of the rationale for the admissibility of factual findings contained in public records, see generally *Ellis,* 745 F.2d at 300 n. 8.

*Celotex Corp.* 914 F.2d 26, 28 (2d Cir.1990) (outlining manufacturers' duties of staying abreast of latest developments in their field, testing fully their products, and inspecting their products to uncover all discoverable dangers). In so doing, the trier of fact may consider the customary methods, standards, and techniques of manufacturing, inspecting, and testing employed by other manufacturers or sellers of similar products. *Clarksville–Montgomery County Sch. Sys.*, 925 F.2d at 1005.

In the instant case, it was appropriate to allow evidence of the design, manufacture, and testing of other sports utility vehicles produced and used near in time to the Trooper II. The record shows defendants possessed this information near the time they developed the Trooper II. The evidence is probative of the question of whether defendants adhered to state of the art knowledge in designing, manufacturing, and testing the Trooper II. Thus, it was properly admitted.

g. *The trial court properly excluded evidence offered by Isuzu*

■ Defendants contend that this court improperly excluded evidence offered by defendants during defendants' cross-examination of plaintiffs' experts. Specifically, defendants argue that this court erred in excluding exhibit 661–A to impeach the testimony of Dr. Nalecz. They assert this exhibit, which is a memorandum purportedly written by Dr. Nalecz criticizing his own ADVS computer program, was admissible to impeach Dr. Nalecz given his testimony that his program used in this case was the "most sophisticated" accident simulation program in the world.

Rule 607 of the Federal Rules of Evidence provides that any witness's credibility may be attacked by any party. The rules do, however, prohibit impeachment of a witness on a collateral matter and prohibit introduction of extrinsic evidence to that end. Fed. R.Evid. 608(b).

A matter is "collateral" if the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for

a purpose other than mere contradiction of the in-court testimony of the witness. If the collateral fact sought to be contradicted is elicited on cross-examination, this safeguarding rule is often expressed by saying that the answer is conclusive or that the cross-examiner must "take the answer."

**McCormick on Evidence** § 45, p. 169–70 (citations omitted).

In the instant case, when defendants confronted Dr. Nalecz with the memorandum, he testified that the computer program used in this case was different from the one he was using in 1992, about which the memorandum was written. Thus, the memorandum related to a computer program not in use during this case. As such, it involved a collateral matter for which introduction of extrinsic evidence for impeachment purposes is prohibited. Exclusion of the exhibit was, therefore, proper.

h. *The trial court properly refused to allow Isuzu to argue and the jury to consider the reconstruction evidence provided by Michael Holcomb.*

■ Defendants contend this court erred by excluding evidence relating to their accident reconstructionist, Michael Holcomb. The thrust of defendants' argument is that during closing arguments, plaintiffs' counsel "opened the door" by alluding to the Holcomb reconstruction as a "mere two pages of calculations." This mention of Holcomb's testimony, defendants argue, should have permitted them to argue, for the jury's consideration, "all of Holcomb's reconstruction evidence." [13]

Defendants' argument is without merit. At trial, given the sanction imposed against defendants discussed in section VI.b., *supra,* this court limited defendants' mention of Holcomb's reconstruction to what was explored by plaintiffs in their closing argument. As defendants concede, plaintiffs' mention of Holcomb's reconstruction dealt with the alleged inadequacy or inaccuracy of his calculations in developing his reconstruction theory.

---

**13.** This court addressed the issue of the sanction imposed against defendants in section VI.b., *su-* *pra,* and will not revisit that discussion here.

This court permitted defendants to explain and comment upon those calculations during their closing argument. Thus, defendants were not prejudiced by restrictions in the scope of their closing argument.

*Motion for Judgment as a Matter of Law*

*Plaintiffs did not fail to submit a prima facie case and Isuzu is not entitled to judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.*

■ Finally, defendants contend that they are entitled to judgment as a matter of law, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, because plaintiffs failed to make a prima facie case. Specifically, defendants argue plaintiffs failed to present sufficient evidence in the following areas: (1) that Isuzu failed to exercise due care in its testing of the Trooper; (2) that the Trooper was negligently designed; (3) that Isuzu failed to exercise due care regarding the content of the visor label; and (4) that Isuzu's negligent design, testing, or failure to warn caused plaintiffs' accident.

■ Whether evidence offered at trial is sufficient to create an issue of fact for the jury is a question of law to be decided by the trial court. *Lange v. Penn Mutual Life Ins. Co.*, 843 F.2d 1175, 1181 (9th Cir.1988); **9A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2524 at 249 (1995).** For federal courts determining the sufficiency of evidence, Professors Wright and Miller make the following observations:

> The question is not whether there is literally no evidence supporting the party against whom the motion is directed but rather whether there is evidence upon which the jury properly could find a verdict for that party. In determining whether the evidence presented at trial is sufficient to withstand a motion for judgment as a matter of law, the district court is not free to weigh the parties' evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences that may be drawn from the evidence.

9A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2524 at 253–59 (citations omitted).

■ It is well-settled that a court must give the party against whom a motion for a judgment as a matter of law is made the benefit of all reasonable inferences that may be derived from the evidence. *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1448 (9th Cir.1986) (*citing McCollum v. Smith*, 339 F.2d 348, 349 (9th Cir.1964)). "If conflicting inferences may be drawn from the facts, the case must go to the jury." *Id.* (*citing Neely v. St. Paul Fire and Marine Ins. Co.*, 584 F.2d 341, 345 (9th Cir.1978)).

In the instant case, this court, viewing the evidence in the light most favorable to the non-moving party, granting that party all reasonable inferences from the evidence presented, and refraining from weighing the evidence, finds defendants' motion without merit. Without revisiting every scintilla of evidence offered by plaintiffs, it is evident that they satisfied their burden of presenting enough evidence from which reasonable people could find in their favor.

For example, plaintiffs presented witnesses and documents outlining technological information commonly known in the automotive industry at the time of defendants' development of the Trooper II. Reasonable people, considering defendants' treatment of this information, could infer either that defendants took notice of the information in developing the Trooper II or did not.

Additionally, plaintiffs presented witnesses who described the visor label. From this evidence, reasonable people could draw their own conclusions about the adequacy or inadequacy of the label in the particular vehicle involved in this case.

Finally, plaintiffs presented abundant evidence regarding their allegation of Isuzu's alleged negligence in designing, testing, and failing to warn as causing plaintiffs' injuries. The record contains sufficient references to Isuzu's alleged failure to exercise ordinary care in heeding industry standards regarding sports utility vehicles to justify presenting this issue to the jury.

## CONCLUSION

Based on the foregoing,

IT IS ORDERED that:

I. Plaintiffs' motion to disqualify David Schultz and the firm of Bowman and Brooke is **MOOT.**

II. Defendants' motion to stay judgment pending termination of further motions and appeal is **GRANTED.**

III. Plaintiffs' motion for additur re: punitive damages and motion for new trial re: punitive damages is **DENIED.**

IV. Plaintiffs' motion to release exhibits from protective order is **DENIED.**

V. Defendants' motion to interview jurors is **DENIED.**

VI. Defendants' renewed motion for judgment as a matter of law or for a new trial is **DENIED.**

DONE AND DATED.